**In the Interest of C.J., I.H., and B.H., Children.**

No. 05–11–00697–CV.

Court of Appeals of Texas, Dallas.

Aug. 2, 2012.

Mary L. Macias, Dallas, TX, Attorney Ad Litem.

Dean M. Swanda, Swanda & Swanda, P.C., Arlington, TX, for Appellant.

Kimberly Lynette Austin, Dallas County District Attorney Office, Dallas, TX, for Appellee.

Craig Watkins, Dallas County District Attorney, for State.

Before Justices MORRIS, MARTIN RICHTER, and LANG–MIERS.

## OPINION

Opinion By Justice LANG–MIERS.

We deny appellant's motion for rehearing and, on our own motion, withdraw our opinion dated April 30, 2012, and vacate the judgment of that date. This is now the opinion of the Court. JH (Father) appeals the trial court's judgment terminating his parental rights. Father raises five issues on appeal. Four of those issues challenge the factual sufficiency of the evidence to support certain findings and another challenges the constitutionality of former section 263.405(i) of the Texas Family Code. We affirm the trial court's judgment.

### BACKGROUND

SJ (Mother) and Father met in approximately 2002. Mother had a child, C, who Mother said was born in September 2002, before she met Father. Mother and Father were never married by ceremony, but they claimed to be married by common law. They had three children together, I, born in 2006; B, born in 2007; and L, born in 2009.

In May 2008, the Dallas County Child Protective Services Unit of the Texas Department of Family and Protective Services (the Department) received a referral concerning possible domestic violence and neglect of the children in Mother and Father's home. Mother agreed to place the children temporarily with K, Father's mother, while the Department investigated the allegations. We will refer to this as the first case.

The Department tried to call K a couple of days later to check on the children, but could not reach her. The Department searched for the children all summer and, in September, Father brought the children to the Department. The Department placed the children in foster care and Mother and Father were ordered to complete certain services before the children could be returned to the home. Mother and Father completed the services and the Department returned C, I, and B to the home in June 2009.

In July 2009, Mother gave birth to L. About a week or two after L's birth, Mother said Father hit her while she was holding L. The Department moved Mother and all four children to a domestic violence shelter. While they were at the shelter, L sustained bilateral skull fractures; she was about two weeks old. Mother said the clasp broke on the bassinet and L fell down two concrete steps. The hospital said the injuries were consistent with a fall and did not keep L overnight. The De-

partment concluded that the injuries resulted from an accident and did not recommend further services for the parents.

Mother left the shelter after L was injured and took all the children home. Father agreed not to stay at home until he completed a batterers' intervention program. At some point, however, he returned to the home without completing the program. In November 2009, Father discovered that L, who was now four months old, was "cold" and not breathing. She had been sleeping on Mother's bed. Emergency medical technicians came to the home, could not revive L, and she was pronounced dead. Dr. Reade Quinton, a medical examiner, testified that he was unable to determine the cause of L's death. He said he could not rule the death a "SIDS-type" death because of L's history of skull fractures and a possible seizure disorder.

Dr. Quinton also testified that he thought the previous skull fractures L sustained were inconsistent with a fall down steps. He said the fractures indicated two points of impact and had to have been caused by significant force. He said if he had seen L at the time of the skull injury he would have asked for a consult by REACH, a group that evaluates children when there is a suspicion of nonaccidental trauma, but he did not see anything in the file to indicate a REACH consult was requested.

After L's death, the State obtained temporary conservatorship of the other three children, moved to terminate Mother's parental rights to all three children, and moved to terminate Father's parental rights to I and B. We will refer to this case as the second case.

The first time this case was tried it resulted in a mistrial. Two days before the case was to be retried, Mother relinquished her parental rights to all three children and the trial proceeded against Father. The jury heard three days of evidence and found that Father had knowingly placed or allowed I and B to remain in conditions or surroundings which endangered their physical or emotional well-being, engaged in conduct or knowingly placed I and B with persons who engaged in conduct that endangered their physical or emotional well-being, or failed to comply with provisions of a court order concerning the actions necessary for Father to obtain the return of the children. The jury found that it was in I's and B's best interests that Father's parental rights to both children be terminated. The jury also found that the Department should be appointed sole permanent managing conservator of all three children.

In accordance with the jury's verdict, the court rendered judgment terminating Father's rights to I and B. The judgment also stated that C's father was unknown and that the unknown father had failed to respond by filing an admission of paternity or a counterclaim for paternity. The judgment terminated C's father's parental rights and appointed the Department sole permanent managing conservator of all three children.

On appeal, Father challenges the factual sufficiency of the evidence to support (1) the jury's findings that termination of his parental rights to I and B was in the children's best interests; (2) the trial court's finding that C's father was unknown; (3) the trial court's finding that termination of C's father's parental rights was in C's best interest; and (4) the jury's finding that the Department should be appointed sole permanent managing conservator of all three children instead of Father's mother, K. Father also argues that former section 263.405(i) of the family code is unconstitutional because it violates the

separation of powers doctrine. The State did not file an appellate brief.

### STANDARD OF REVIEW AND APPLICABLE LAW

A trial court may terminate the parent-child relationship if the fact-finder finds by clear and convincing evidence that (1) a parent committed one or more of the enumerated statutory acts or omissions, and (2) termination is in the best interest of the child. TEX. FAM.CODE ANN. § 161.001 (West Supp.2012); *In re W.D.W.*, 173 S.W.3d 607, 609 (Tex.App.-Dallas 2005, no pet.). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (West 2008).

In this appeal, Father does not challenge the findings that he committed one or more of the enumerated statutory acts or omissions. He challenges only the evidence supporting the findings that termination of his parental rights is in the best interests of the children.

■ In reviewing the factual sufficiency of the evidence, we look at all the evidence and "give due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002). To be factually sufficient, the disputed evidence must be such that a fact-finder could reasonably have formed a firm belief or conviction about the truth of the Department's allegations. *In re C.R.*, 263 S.W.3d 368, 371 (Tex.App.-Dallas 2008, no pet.); *In re J.R.K.*, 104 S.W.3d 341, 343 (Tex.App.-Dallas 2003, no pet.).

■ Prompt and permanent placement of a child in a safe environment is presumed to be in the child's best interest. TEX. FAM.CODE ANN. § 263.307(a). There is also a strong presumption that the best interest of the child will be served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex.2006) (per curiam). Section 263.307(b) of the family code provides a list of factors to consider when determining whether parents are willing and able to provide their child with a safe environment. The listed factors that are relevant to this case include

- whether there is a history of abusive or assaultive conduct by the family;
- whether there is a history of substance abuse by the family;
- the willingness and ability of the family to complete counseling services and to cooperate with an agency's close supervision;
- whether the family demonstrates adequate parenting skills, including providing minimally adequate health and nutritional care;
- a safe physical home environment;
- protection from repeated exposure to violence; and
- whether an adequate social support system is available to the child.

*See* TEX. FAM.CODE ANN. § 263.307(b). The Texas Supreme Court has also established a list of nonexclusive factors relevant to a review of a finding on the best interest of a child, including

- the desires of the child;
- the present and future physical and emotional needs of the child;
- the present and future emotional and physical danger to the child;
- the parental abilities of the person seeking custody;
- programs available to assist those persons in promoting the best interest of the child;
- plans for the child by those individuals or by the agency seeking custody;

- the stability of the home or proposed placement;
- the acts or omissions of the parent; and
- any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976). Some of the *Holley* factors overlap the statutory considerations. *See C.R.*, 263 S.W.3d at 375.

## PATERNITY OF C

In issue one, Father contends that he established he is C's father and the evidence is factually insufficient to support the trial court's judgment stating that C's father is unknown.

### The Court's Judgment

The judgment states that C's father failed to register with the paternity registry, failed to appear, failed to respond by timely filing an admission of paternity pursuant to subchapter D of Chapter 160 of the family code, failed to file a counterclaim for paternity, and failed to establish any right or interest to C. The trial court's judgment also states that a jury was waived with regard to the paternity of C; however, we note that the family code requires the trial court to adjudicate paternity of a child without a jury. TEX. FAM. CODE ANN. § 160.632.

### Standard of Review

■ A proceeding to adjudicate the parentage of a child is a civil proceeding governed by the rules of civil procedure. *Id.* § 160.601(b). When an issue is tried to the court, but the court does not make findings of fact or conclusions of law, as in this case, we imply all findings necessary to support the trial court's judgment. *See Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex.1992). When, as in this case, a complete reporter's record is filed, the court's implied findings are not conclusive and may be challenged for legal and factual sufficiency. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex.2002).

■■ To analyze a factual sufficiency challenge, we consider and weigh the evidence and set aside the finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001). We review conclusions of law to determine whether the trial court correctly drew the legal conclusions from the facts. *BMC Software*, 83 S.W.3d at 794.

### Establishment of Parent–Child Relationship

The family code states that a father-child relationship is established between a man and a child by (1) an unrebutted presumption of the man's paternity of the child under section 160.204; (2) an effective acknowledgment of paternity by the man under subchapter D; (3) an adjudication of the man's paternity; (4) the adoption of the child by the man; or (5) the man's consenting to assisted reproduction by his wife under subchapter H, which resulted in the birth of the child. TEX. FAM.CODE ANN. § 160.201(b). Father does not contend that he established a father-child relationship with C under subsections (2), (3), (4), or (5), and there is nothing in the record to support an argument under those subsections. His argument on appeal appears limited to subsection (1), an unrebutted presumption of the man's paternity of the child under section 160.204.

Section 160.204(a) provides several methods by which a man is presumed to be the father of a child:

(1) he is married to the mother of the child and the child is born during the marriage;

(2) he is married to the mother of the child and the child is born before the 301st day after the date the marriage is terminated by death, annulment, declaration of invalidity, or divorce;

(3) he married the mother of the child before the birth of the child in apparent compliance with law, even if the attempted marriage is or could be declared invalid, and the child is born during the invalid marriage or before the 301st day after the date the marriage is terminated by death, annulment, declaration of invalidity, or divorce;

(4) he married the mother of the child after the birth of the child in apparent compliance with law, regardless of whether the marriage is or could be declared invalid, he voluntarily asserted his paternity of the child, and:

 (A) the assertion is in a record filed with the bureau of vital statistics;

 (B) he is voluntarily named as the child's father on the child's birth certificate; or

 (C) he promised in a record to support the child as his own; or

(5) during the first two years of the child's life, he continuously resided in the household in which the child resided and he represented to others that the child was his own.

TEX. FAM.CODE ANN. § 160.204(a).

### Discussion

 On appeal, Father contends that he and Mother had C "together while [they] were common law married." After citing the evidence on this point, Father concludes his argument by stating "there was admittedly conflicting evidence on whether [C] had already been born when Mother met Father, but Father contends a finder of fact could not reasonably have formed a firm belief or conviction that he had not established he was [C]'s biological father." This argument appears to rely on subsection (1) of section 160.204(a). *See id.*

Mother's and Father's testimony on this issue was conflicting. Father testified that he wanted to think he was C's father, but he said he was "probably not" her biological father, and he presented no scientific evidence that he was C's biological father. He also testified that Mother gave birth to C when she was 16, and that Mother was 17 when she moved in with him. On the other hand, Mother testified that she gave birth to C three months before she met Father. Mother's sister corroborated Mother's testimony. And in 2008, Mother filed an affidavit of status in which she stated that she had never been married to C's father, had never attempted to marry C's father, and paternity of C had not been established. The affidavit named "Carrie," who lived in Irving, Texas, as C's biological father.

Dr. V.J. Lair, a psychologist who evaluated Father as part of the court-ordered services in the first case, testified that Father told her that he was not C's biological father, although "he considered himself to be her father." Father also told Dr. Lair that he would lie to C whenever she asked why her last name, which was the same as Mother's last name, was different.

In summary, section 160.204(a)(1) states that a man is the presumed father of the child if he is married to the mother and the child is born during the marriage. TEX. FAM.CODE ANN. § 160.204(a). The record shows the evidence was disputed about whether Father and Mother had even met when Mother gave birth to C. Although Father testified he wanted to believe he was C's biological father, it is undisputed

that Mother thought someone else was C's biological father. The record contains evidence supporting the trial court's decision that the paternity of C was unknown, and we conclude that, based on this evidence, the trial court's decision is supported by factually sufficient evidence. *See Dow Chem.*, 46 S.W.3d at 242. We resolve issue one against appellant.

### BEST INTERESTS OF THE CHILDREN

■ In issues two and four, Father argues that the evidence is factually insufficient to support the findings that termination of his parental rights was in the children's best interests.

In issue two, Father challenges the trial court's finding with respect to C. Father did not raise issue two, however, in his statement of points on appeal. *See* Act of May 22, 2001, 77th Leg., R.S., ch. 1090, § 9, 2001 Tex. Gen. Laws 2396, 2397–98, (requiring appellant to file statement of points on appeal) (repealed 2011) (current version at TEX. FAM.CODE ANN. § 263.405 (West Supp.2012)). And he argues that to the extent former section 263.405 required him to raise issue two in a statement of points on appeal, it is unconstitutional. But because we concluded in issue one that Father did not establish he is C's presumed father, we do not need to decide issue two.

In issue four, Father argues that the evidence is factually insufficient to support the jury's findings that termination of his parental rights was in I's and B's best interests. Father argues that Mother was "the real threat to the children," not him, because L fell while in Mother's care and "ostensibly died" while in Mother's care. He also pointed out that Mother would accuse him of hitting her and then recant. Father argues that the evidence shows he was "moving on without" Mother and that "it was not likely" he and Mother would get back together.

Father also argues that he has a warm and loving relationship with the children. He argues that he was the one who returned the children to the Department in September 2008 in the first case. And he points to his successful completion of the Department's services plan in the first case. He argues that he did not complete the services plan in the second case because he was in jail for seven months. And he contends that the results of his psychological assessment showed that he has an "aversion to corporal punishment" and that the children had made no outcries of physical abuse.

Father also argues that the State did not offer any evidence about its plans for the children or whether the foster parents were interested in adopting the children, and, consequently, the children face uncertainty regarding their permanent home. He admitted that he was incarcerated on a pending criminal charge, and he asked the jury to appoint his mother as managing conservator of the children.

We conclude that the record supports the jury's findings that termination of Father's parental rights to I and B was in the children's best interests. The evidence showed a history of abusive and assaultive conduct in Mother and Father's home. The Department's first case was based on a referral of possible domestic violence and neglect of the children. Mother admitted at trial that she had called the police several times to report that Father had "physically abused" her, but when the Department asked, "[D]id [Father] ever strike you physically?" she said "No." She recalled that she went to the police station in July 2009 to report that Father had "physically struck" her while holding L, but she said she lied to the police. Mother invoked her Fifth Amendment privilege

not to answer many of the Department's questions concerning her reports to police about the physical abuse. It is undisputed, however, that Mother sought and obtained a protective order against Father in 2008. There is no evidence the children were physically abused, but there is also no evidence that Father protected the children from observing the violence in the home. And there is some evidence in the record that C did observe Father hitting Mother while Mother was holding L.

Additionally, after L died, Father was arrested on a charge of aggravated assault with a deadly weapon. The police officers who arrested Father testified that Father was "very abusive, uncooperative, verbally abusive...." They characterized Father's language as "vulgar" and said it lasted from the time Father was handcuffed through the booking process about an hour later. One of the officers said Father was in the officer's personal "top ten" for being uncooperative.

The record also showed that Father was indicted for aggravated assault with a deadly weapon in 1997, pleaded guilty to the lesser offense of assault, received two years' deferred adjudication, and the charge was dismissed in 1999. Father testified that he had "been arrested a bunch of times" including for unlawfully carrying a weapon, possession of marijuana, and theft. He testified that he currently has three charges pending against him—aggravated assault, assault, and receiving and possessing stolen property.

In addition to Father's own criminal history, the evidence showed that some of Father's family members, who would have access to the children, also had criminal records. Both of Father's brothers have criminal histories, and one of his brothers is in prison for aggravated assault and "probably" has been convicted of assault, possession of methamphetamine, evading arrest, and theft. The record appears to suggest that Father's father also had a criminal history, and K testified that he assaulted her, sometimes in front of Father and his siblings.

The record also shows that both Mother and Father used drugs. The Department received a referral in the first case alleging Father was smoking "crack" and using "ice" in front of the children. Armstrong testified that Mother told her Father used "crack," methamphetamine, and marijuana. Dr. Lair testified that Father denied any drug use. But Father admitted at trial that he smokes marijuana from time to time, although it was "not often," and that he used cocaine when he was 18 years old. At trial, Father denied using anything "harder" than marijuana. Father also admitted that he had been convicted of possession of marijuana. He tested positive for marijuana on one of the Department's drug tests, and he refused to take the other drug tests the Department requested. Armstrong testified that she had smelled marijuana in Mother and Father's house, on their clothing, and in their hair. Father testified that Mother used drugs throughout their relationship. Later he testified that he first came to realize that Mother was using drugs in September 2008.

The evidence also showed that Father and Mother failed to comply with court-ordered services. During the first case, Mother and Father hid the children from the Department from May 2008 until September 2008. At trial, Father denied that he hid the children, but Dr. Lair testified that Father said he and Mother were hiding the children, and Mother testified that they were hiding the children from the Department during that time. When Father eventually returned the children to the Department in September 2008, the children were dirty, had lice, needed den-

tal care and immunizations, B had fleas in his diaper, and C had ink in her ear where she had tried to remove a bug from her ear with a pen. The Department's investigation suggested that Mother had left the children alone with Father and that when Father was working, C, who was five at the time, baby-sat the younger siblings.

Although the record showed that Mother and Father successfully completed the Department's services plan in the first case, it also showed that neither of them complied with the court's orders in the second case. Father was required to successfully complete a batterers' intervention program, which involved participating in 15 to 25 sessions, but he attended the intake and two additional sessions and then stopped and was discharged. He also refused to attend other required services, such as grief counseling. Father said he did not have enough time to finish the services because he was in jail, but he conceded that about a year passed between the filing of the second case and the time he went to jail. A Department caseworker explained that it was important for the parents to complete the services plan prescribed for them because it showed the Department that the parents were actually working toward getting their children back and the "second set of eyes and ears" from the services providers helped the Department know whether the parents were making progress toward improving their home environment.

The record also shows that Father refused the opportunity to participate in a church-based recovery program. Armstrong, a member of Cedar Hill Church of Christ, testified that the church has an Overcomers Ministry, which she described as a Bible-based 12–step recovery program providing encouragement and support for people with "hurts, habits, or hang-ups." She said Mother attended the program for

about six months and Father attended a few sessions, but then stopped going and eventually made Mother stop participating in the program. Father told Armstrong that "outsiders were interference" and all Mother and Father needed was their family.

Armstrong also testified that she volunteered to supervise the children's visits to the home when the Department was transitioning the children back to the home in the first case. She said she observed Mother and Father arguing and characterized their relationship as "volatile."

The Department also presented evidence that Mother and Father's behavior during their supervised visits with the children was inappropriate. A Department caseworker testified that Mother and Father usually brought junk food to the children and the children would sometimes gorge themselves to the point of getting sick. She said Father would run around with the boys and get them "really worked up." She characterized the visits as "extremely wild" and "the most chaotic" she had ever witnessed. She said her co-workers on the opposite side of the visiting room would arrange to take lunch or leave during the visits because they were so disruptive.

Additionally, the caseworker testified that the parents were forbidden from asking questions about where the children lived, the school they attended, and other such questions because the identity of the foster family and the children's location were confidential. The caseworker said that during visitation the parents asked the children about where they attended school, their address, and other confidential information. She said that after one visit, Mother and Father followed the person who brings the children to visitation in an apparent attempt to learn where the children lived. A caseworker testified that

not long after this attempt, C began having nightmares that someone was coming to get her and harm her foster family. A caseworker testified that the parents' behavior during the supervised visits was endangering C's emotional well-being. She said C became visibly upset during some visits over comments that Mother or Father made and would ask to go to the bathroom where she would get sick.

The Department decided to move the children to another foster family and stopped all visitations with Mother and Father. A caseworker testified that the two boys, I and B, had been physically violent with each other during the supervised visits, but, after the visits stopped, their behavior "improved immensely" and the boys "are totally different kids than they were when we were still having visitation." She also testified that C had a flat affect in the beginning, but now has self-esteem "through the roof." She said in just a few months, C went from being shy and not very active to being involved in school plays and other activities that she would not have done before.

Dennis Caughy, a licensed social worker who began working with the children in 2010, testified that he helps children find better ways to express themselves and manage their emotions. He confirmed that C looked "pretty flat . . . pretty sad" when he first began seeing her. He said she was "[k]ind of quiet, very self-conscious" and also anxious and depressed. He said she was very protective of I and B and almost a "mother hen sometimes." He said I was very anxious, almost fearful when they first met, but over time became more comfortable and opened up to him. Caughy testified that B was a "handful" when they first met, had "a lot of aggressiveness to him," and "wet himself in front of" Caughy. He said the children have "really grown a lot" in the time he has seen them and that he has noticed improvement in the children's behavior since moving to the second foster home. He said that there is "consistency and the predictability" in that home and the children's "behavior is much more stable." He also said the children were "more developmentally emotionally on target agewise now than they were before." He testified that "what's been interesting to me is there's really not an outward expression of grief or loss or longing for or home sickness for parents."

Although the State did not present evidence about whether the foster parents intended to adopt the children, it did present evidence of improvement in the children's behavior and educational development since being placed in foster care. In addition to Caughy's testimony about the children's improvement, the children's volunteer advocate testified that she has been involved with the children from the beginning of the first case. She said she visited the children at the foster home about two weeks before trial and said they were "doing wonderfully." She said the children were very excited to tell her about things they did at school, I had made significant progress in speech development and was able to "hold more significant conversations," and B practiced telling her what different animals were. Her opinion was that it was in the children's best interests to terminate Father's parental rights so that the children could be adopted.

In summary, the evidence showed that Father physically abused Mother, was in jail on a charge of aggravated assault with a deadly weapon, had other criminal charges pending, and had been arrested "a bunch of times." The evidence showed that Father used marijuana and perhaps other illegal substances, failed to comply with court orders in the second case, refused the help of a church-sponsored re-

covery program, hid the children from the Department for almost five months, lacked adequate parenting skills and an adequate social support system, endangered C's emotional well-being, and did not have a stable home environment. Based on this evidence, we conclude that the jury could reasonably have formed a firm belief or conviction that termination of Father's parental rights was in I's and B's best interests. We resolve issue four against appellant.

### APPOINTMENT OF MANAGING CONSERVATOR

▇ In issue five, Father challenges the factual sufficiency of the evidence to support the jury's finding that the Department should be appointed sole permanent managing conservator of the children instead of his mother, K.

The State presented evidence that the Department did not agree with Father's request to place the children with K. Evelyn Davis, an administrator with Adult Protective Services, an agency of the Department, testified that K was found unconscious in 2007 and APS became involved. Davis testified that the APS investigation revealed that K did not have a home and was living either in a shed or a pop-up trailer, she had diabetes and had been discovered in a diabetic coma, she was depressed, and she had a history of an aneurysm and a stroke. Davis testified that K also reported stomach problems, a history of heart attack, and numbness in her extremities.

K testified and denied that she was found unconscious in a diabetic coma. She said that her house burned in 2007 and she was looking through the rubble trying to find baby pictures. She said she collapsed from the heat on her way back to the car and fell in an ant bed. She said APS got involved, but dropped the case after checking out Father's home where she was staying.

K testified that she was treated for an ovarian tumor in 1990, that she recovered, and that another tumor was discovered in 2003. She said she had three surgeries in one year and has felt great for the last two years. She testified that she has a history of seizures. She said her last seizure occurred about six months before trial and she characterized it as "mild." K admitted that she had a brain aneurysm around 2002, two strokes around 1995, and a heart attack in 1997. She blamed her weight, which was 300 pounds at that time, for the strokes. She said she no longer weighs 300 pounds because of the "[c]hemo" for cancer that she received in 1990 and again in 2003. K testified that she takes medication at night for restless legs syndrome, which makes her a little drowsy, and daily medications for seizures, diabetes, high blood pressure, circulation, and depression.

There was some evidence in the record to suggest that K may have been diagnosed with colorectal or gastrointestinal cancer, but when Armstrong, the church support group member who is also an oncology nurse, tried to talk to K about her condition to see if the medical school where Armstrong worked could provide any help to K, K "acted like she didn't know what [Armstrong] was talking about, just that she was sick." Armstrong said Mother and Father told her that K was addicted to pain pills. Armstrong testified that in her opinion as a nurse if K is in as much pain and takes as much pain medication as K has said, K cannot care for three children because it makes a person sleepy and "[y]ou don't have all your wits about you." Armstrong also testified that she did not believe the children should ever be returned to the family because she has "seen the environment that they both came from. I've seen the interactions and I know people can change when they want to, but kids can't wait on somebody to

change when that's all they've got. They deserve a chance to me."

Mother testified that she believed K was "physically capable and healthy enough to take care of three children." And Father's cousin testified that she has observed K, her aunt, with Father's children and described K as "a dream grandmother.... She's very attentive to their needs and would be just like anyone's grandmother, I guess. It's your grandma. She's a grandma." The cousin said K is "very good with children" and is "a good person to have on your side" and it would be in the children's best interests to make K managing conservator. She testified that she and "a number of people in [their] family" would be available and willing to act as a support system for K if K got the children. She also testified that if the children were placed with K, she would not be concerned in any way.

With regard to K's financial condition, K testified that she receives $1,500 a month in disability payments and that her lawyer is trying to get $70,000 in back disability payments for her. K testified that she does not have a permanent home. She said she stays with her mother in government housing in Waxahachie, and then leaves a while to stay with her daughter, and then goes back to stay with her mother. K testified that "you can come and stay [in government housing] for a couple of weeks and then you can leave and come right back and stay." She said she last had a permanent home in 2007. But she said her brother has told her that she can live in his rent house for free if she gets the children. She said she does not live there now because she does not want to turn on the electricity and water unless she gets the children. K also testified that in the past she had trouble keeping a telephone, but her daughter "got a family plan and she put me on for $10 a month" so she now has a phone.

With regard to whether K can protect the children from harm, the evidence showed that K was a victim of spouse abuse and that her husband, D, abused K in front of Father and his siblings when they were children. K told the Department that she filed for a divorce and then her house burned down. She said the fire department could not tell her that D burned the house and because she was afraid of D she would not pursue a divorce. At trial, K testified that although she and D separated in 2007, she is still married to D and has been for 40 years. She said she sees D only occasionally because "he's mostly in Arkansas." But she also acknowledged that she and D still have a "physical relationship" and that she stays with him when he is in town. She said D was abusive to her because he was an alcoholic. She testified that D is no longer an alcoholic and has changed. She testified that she can protect the children from D.

The record also showed that K did not comply with the Department's rules concerning K's temporary conservatorship of the children in the first case. After the Department received the first referral in 2008, Mother and the Department agreed to let C, I, and B stay with K in Alvarado, Texas. Mother and K both signed the Department's safety evaluation and plan whereby the children would stay with K for 30 days in Alvarado and Father would have only supervised visits. The plan stated that the Department would monitor the children by telephone and visits. But a couple days after K took the children, the Department was unable to locate K. K testified that during those 30 days, she lived in three different places, only one of which was in Alvarado. And she said she did not read the Department's plan authorizing the Department to call and visit her to monitor the children's welfare. K testi-

fied that after the 30 days were over, she stayed with Mother, Father, and the children at various motels.

In summary, the evidence concerning K's suitability to be appointed the children's sole permanent managing conservator showed that K has an extensive medical history including strokes and a heart attack. At the time of trial, K took medications for, *inter alia*, seizures, depression, high blood pressure, and diabetes. She has no permanent home and no stable home environment; she violated the Department's plan when she had temporary custody of the children in the first case; and she maintained a relationship with an abusive husband. We resolve issue five against appellant.

Our resolution of issues one, two, four, and five makes it unnecessary to consider Father's third issue concerning the constitutionality of former section 263.405(i) of the family code.

### CONCLUSION

We affirm the trial court's judgment.