

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-15-00064-CV

**IN THE INTEREST OF K.R.E.T.**, et al., Children

From the 285th Judicial District Court, Bexar County, Texas
Trial Court No. 2013-PA-02260
Honorable Dick Alcala, Judge Presiding

Opinion by:     Patricia O. Alvarez, Justice

Sitting:        Patricia O. Alvarez, Justice
                Luz Elena D. Chapa, Justice
                Jason Pulliam, Justice

Delivered and Filed:  July 22, 2015

AFFIRMED

B.T. appeals the trial court's order terminating her parental rights to her children K.R.E.T., C.R.A., D.S.T., and M.J.T.  In her only issue, B.T. asserts the evidence was neither legally nor factually sufficient for the trial court to find by clear and convincing evidence that terminating her parental rights was in her children's best interests.  We conclude the evidence is both legally and factually sufficient, and we affirm the trial court's order.

### FACTUAL AND PROCEDURAL BACKGROUND

On September 18, 2013, the Department of Family and Protective Services petitioned to remove B.T.'s children from her based on allegations of physical abuse.  The trial court granted the petition and appointed the Department as temporary sole managing conservator of the children.  One of the children, C.R.A., was later placed with his biological father, D.A.  After several

permanency hearings and a jury trial on the merits, the trial court terminated B.T.'s parental rights to her four children based on subparagraphs (D), (E), (F), (I), and (O) of Family Code section 161.001(1), *see* TEX. FAM. CODE ANN. § 161.001(1) (West 2014), and because it was in the children's best interests, *see id.* § 161.001(2).

B.T. does not challenge the trial court's findings concerning the statutory grounds for involuntary termination of her parental rights.  *See* TEX. FAM. CODE ANN. § 161.001(1); *see also In re J.F.C.*, 96 S.W.3d 256, 261 (Tex. 2002).  Instead, she argues the trial court erred because the evidence was neither legally nor factually sufficient for it to find by clear and convincing evidence that terminating her parental rights was in her children's best interests.  *See* TEX. FAM. CODE ANN. § 161.001(2); *accord In re J.F.C.*, 96 S.W.3d at 261.

## SUFFICIENCY OF THE EVIDENCE

### A.    Standard of Review

"Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them."  *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi 2010, no pet.) (citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)).  As a result, appellate courts must strictly scrutinize involuntary termination proceedings in favor of the parent.  *Id.* (citing *In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi 2006, no pet.)).

An order terminating parental rights must be supported by clear and convincing evidence that (1) the parent has committed one of the grounds for involuntary termination as listed in section 161.001(1) of the Family Code, and (2) terminating the parent's rights is in the best interest of the child.  *Id.* § 161.001; *In re J.F.C.*, 96 S.W.3d at 261.  "There is a strong presumption that the best interest of a child is served by keeping the child with its natural parent, and the burden is on the [Department] to rebut that presumption."  *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston

[14th Dist.] 2012, no pet.). The same evidence of acts or omissions used to establish grounds for termination under section 161.001(1) may be probative in determining the best interest of the child. *Id.*

When a clear and convincing evidence standard applies, a legal sufficiency review requires a court to "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266; *accord In re J.L.*, 163 S.W.3d 79, 85 (Tex. 2005). If the court "determines [a] reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true," the evidence is legally sufficient. *See In re J.L.*, 163 S.W.3d at 85; *In re J.F.C.*, 96 S.W.3d at 266.

Under a clear and convincing standard, evidence is factually sufficient if "a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *accord In re K.R.M.*, 147 S.W.3d 628, 630 (Tex. App.—San Antonio 2004, no pet.). We must consider "whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *In re J.F.C.*, 96 S.W.3d at 266; *accord In re C.H.*, 89 S.W.3d at 25.

**B.    Best Interests of the Children**

A trial court may terminate a parent's rights to a child if it finds, inter alia, such "termination is in the best interest of the child." Tex. Fam. Code Ann. § 161.001(2); *accord In re J.F.C.*, 96 S.W.3d at 261.

*1.    Evidence Regarding the Children's Best Interests*

Applying the applicable standards of review for sufficiency of the evidence, we examine all the evidence, *see In re J.F.C.*, 96 S.W.3d at 266; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005) (crediting or disregarding evidence), and recite below the evidence that

especially pertains to the *Holley* factors, *see Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). During four days of testimony, the jury heard from thirteen different witnesses and arguments of various counsel for the Department, B.T., each of the fathers, and the children's ad litem.

### a. D.A. (C.R.A.'s Father) and S.H. and C.H. (D.A.'s Grandparents)

D.A., S.H., and C.H. testified about the abuse allegations and their interactions with B.T. B.T. failed to have regular visitation with C.R.A.; when she did see C.R.A., she was often late and did not stay for the entire time allotted. Moreover, when C.R.A. would try to discuss incidents that happened in the past, B.T. simply changed the topic and refused to engage in a conversation with C.R.A. They described C.R.A.'s demeanor during and after visits with B.T. and his physical and emotional reactions to the allegations. C.R.A. refused to see B.T. for several months and exhibited signs of anxiousness before his visits. They also described C.R.A. suffering from nightmares after his visits with B.T. Although C.R.A.'s anger issues have decreased after counseling, he still exhibits signs of being afraid of water, which they attribute to incidents where J.G., B.T.'s fiancé, held C.R.A. under water.

All three witnesses described B.T. as unable to care for or protect C.R.A. or his siblings. Additionally, D.A. testified that B.T. had done "absolutely nothing" to contribute to or participate in C.R.A's academics, medical appointments, school activities, or financial stability. B.T. neither bought Christmas presents nor contacted C.R.A. during the Christmas holidays. In fact, the last visit B.T. had with C.R.A. was the first week of December, 2012. D.A. further opined that B.T. "can't and she won't and she hasn't protected" C.R.A. or his brothers and sisters.

Because B.T. began her relationship with D.A. prior to K.R.E.T.'s birth, D.A. and his grandparents have had a relationship with K.R.E.T. her entire life. S.H. testified that from the beginning, B.T. showed little concern for K.R.E.T.'s apparent developmental delays.

b.     Angie Steinau, Caseworker

Angie Steinau, B.T.'s caseworker, testified it would be in the children's best interests for B.T.'s parental rights to be terminated.  She also testified as follows.

(1)     Protection of the Children

Between the years of 2009 and 2011, there were twelve different referrals to Child Protective Services regarding B.T.'s children.  These incidents included nine cases of alleged physical abuse, two cases of alleged negligent supervision, and one case of alleged sexual abuse.

The Department's allegations centered on physical abuse of the children perpetuated by J.G., who was B.T's boyfriend at the time of the allegations.  The abuse included J.G. striking C.R.A with a seatbelt when B.T. was present.  Steinau discussed the children's outcries with B.T., and J.G. was indicted for the alleged abuse.  Yet, almost without exception, B.T. continued to believe the bruises, scratches, and black eyes were the result of accidents and "rough housing." Steinau explained the first item on B.T's service plan provided that B.T. "will demonstrate and show willingness to protect her children from harm."  Steinau specifically told B.T. that it was "vital" that she "cut all contact and communication" with J.G. to regain possession of her children. Yet, B.T. remained in a relationship with J.G.

When Steinau was looking for placement for the children, B.T. suggested a family friend, Yvette Fischer.  B.T. failed to disclose the previous allegations that K.R.E.T. had been sexually abused in Fischer's home.  When asked, B.T. responded the perpetrator was deceased and that the allegations were never proven.

(2)     Support, Care for Children

Steinau further opined that throughout the duration of the case, B.T. was unable "to put her children's needs before her own, to provide clothing, shelter, medical care, food, and proper supervision.  Additionally, B.T. failed to secure consistent housing to provide shelter for the

children or "learn new behaviors that encourage stability, self-worth, or cooperation with all family members." B.T. testified that her immediate plan included a two bedroom apartment located on De Zavala. It was her plan to drive the children to Universal City for school, then drive back to attend school on De Zavala, go to work, pick the children up from school and take them to her work until 9:00 p.m. Moreover, she could not provide a reasonable basis for affording the rent for the apartment in question.

Once again, Steinau emphasized B.T.'s failure to terminate her relationship with J.G. Regardless of Steinau's attempts, B.T. did not recognize the signs of domestic violence, including yelling, throwing things, or physical abuse. Finally, Steinau testified B.T. failed to "demonstrate her ability to protect her children from abuse and neglect." Ultimately, the Department "had no other choice but to move forward with termination [of B.T.'s parental rights] because [B.T.] still was not acknowledging that this happened from this man who hurt her children."

B.T. had not provided any financial support or clothing for the children since they moved back to San Antonio. Although Steinau made several requests, B.T. failed to provide proof of employment or residency. B.T. also failed to obtain the psychological support Steinau suggested.

### (3) Other Factors

Steinau testified that during different periods of time, the children have asked when they are "going home." She further opined that the children do not express a clear position regarding termination—they miss B.T., but do not miss the unstable living environment. Steinau opined the children have not had a stable environment with B.T. since they were born. Although she offered several different services to assist, B.T. failed to take advantage of any of the services.

> They have not had stability since they were born, basically. They had been moved around. I don't—because of the moving and the instability, I think the very basic needs were met, but I think a child should be provided more than that. Yes, they had a roof over their head. I believe somebody testified at one point that [B.T.] was in a car. I don't know how long that happened. I don't know how they got food. I

see a pattern—a strong pattern of domestic violence. I don't see that pattern of domestic violence has been broken. I don't see a change of behavior. I don't see [B.T.] having put her children's needs before her own through the duration of this case. I feel that the lack of acknowledgement about what happened to her children and who caused them to be harmed was never discussed. And I don't think it was ever really believed by [B.T.], and I think that continues to put them in danger.

Although Steinau indicated great concern regarding B.T.'s lack of housing and employment, she reiterated this was not the primary reason for her recommendation that termination was in the children's best interests.

The primary reason is the failure to keep her children safe, and the possibly continued relationship with [J.G.], who was—it was a severe domestic violence situation, and the kids were harmed, they were hurt. . . . And the failure to acknowledge that [J.G.] did hurt her children.

### c.   R.H., the Current Placement for K.R.E.T., D.S.T., and M.J.T.

R.H. testified that she has cared for K.R.E.T., D.S.T., and M.J.T. since August of 2014. R.H. explained that she had known B.T. for over eleven years, since B.T. was fifteen years old. B.T. used to babysit R.H.'s children. She indicated that she was saddened to discover that B.T. was still in a relationship with J.G.

Regarding the children, R.H. relayed her attempts to acclimate the children to an environment where they must follow the rules. K.R.E.T. struggles emotionally, verbally, and academically; on her last report card, she was failing every subject. R.H. suspects K.R.E.T. is dyslexic, but no diagnosis has been made. K.R.E.T. still has issues with bedwetting and lying. D.S.T. is doing very well academically, but still exhibits anger management issues and has "been written up at daycare numerous times for hitting people, throwing chairs, hitting a teacher." M.J.T. also has anger issues and actually "beat up his daycare teacher."

R.H. expressed some frustration with B.T. regarding her ongoing relationship with J.G. "I encouraged her to terminate her relationship with him because, to me, her children are more important than he is."

### d. Barbara Bass, Court Appointed Special Advocate

Barbara Bass first met B.T.'s four children in October of 2013. She explained that she has seen the children two to three times a month over the last sixteen months. During that time, she has seen the children in the placement homes, at school, at day care, and during parent-child visits with B.T. Bass explained that originally, she felt B.T. was working to remedy the issues, and in March of 2014, Bass recommended reconciliation to the trial court. By January of 2015, that recommendation had changed and Bass was recommending B.T.'s parental rights be terminated.

Bass explained that she attended a lot of parent-child visits and in her opinion, B.T. "didn't seem to put the kids first." Bass described B.T. as more concerned financially with having her nails done than having money to buy the children ice cream, and although B.T. would interact with her children, she was always in a hurry to leave. "And I know it sounds financial, but that's a big thing with children is you have to put away money to take care of your children and take care of their needs, and at this point it's just emotional needs." Bass averred that, in her opinion, she did not believe that B.T. could protect and take care of the children.

### e. Yvette Fischer

Fischer testified that she cared for K.R.E.T., D.S.T., and M.J.T. between March and August of 2014. Fischer relayed that the children visited with B.T. via phone twice weekly, on Sundays and Wednesdays. On two occasions, B.T. put J.G. on the phone and Fischer immediately disconnected the call. When Fischer confronted B.T., she claimed the individual was not J.G. When asked, Fischer explained that she knew J.G. and knew his "distinctive voice." Fischer further relayed, that after a couple of months, things "started turning sour." B.T. would not talk to her and failed to visit the children on several occasions. Fischer ultimately asked the Department to remove the children because five children was more than she could handle.

## C.    *Holley* **Factors**

The jury is the sole judge of the weight and credibility of the evidence, including the testimony of the Department's witness.  *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (requiring appellate deference to the fact-finder's findings); *City of Keller*, 168 S.W.3d at 819.  The factors a fact-finder uses to ascertain the best interests of the children were set forth in *Holley*, 544 S.W.2d at 371–72; *accord In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012) (reciting the *Holley* factors).  The *Holley* Court warned that "[t]his listing is by no means exhaustive, but does indicate a number of considerations which either have been or would appear to be pertinent." *Id.* at 372.  We address the major issues faced by the jury below.

### 1.    *The Desires of the Children*

In the present case, Steinau testified that the children did not express an opinion on the termination of B.T.'s parental rights.  With the exception of C.R.A., the children expressed that they missed their mother, but they simultaneously expressed their desire for a more stable living arrangement.  Although the children expressed that they missed their mother, this cannot be the sole deciding factor.  *See Phillips v. Tex. Dept. of Protective & Regulatory Servs.*, 25 S.W.3d 348, 356 (Tex. App.—Austin 2000, no pet.) ("What children want, however, is not always in their best interests. We hold that the desire of the children to stay with their mother does not outweigh the other evidence that their home life was chaotic, that their emotional and physical well-being was threatened, and that their mother was unwilling to improve as a parent.").

### 2.    *The Emotional and Physical Needs of the Children and Protecting the Children from Danger Now and in the Future*

Prior to this incident, twelve calls were made to the Department regarding B.T. and her children, including one case where the Department removed the children.  The various cases included physical abuse, neglectful supervision, and an allegation of sexual assault involving

K.R.E.T.  *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth, 2003, no pet.) ("[A]busive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child.").

Throughout the pendency of this case, B.T.'s actions showed her inability to care for the emotional and physical needs of the children and to protect her children from danger.  Although J.G. was under indictment for injuring her children, and the Department provided B.T. with the children's outcries of abuse by J.G., B.T. continued her relationship with J.G.  Additionally, when the Department sought suitable housing for the children, B.T. recommended Fischer and allowed the Department to place the children in Fischer's home without alerting the Department of the prior allegations of the sexual assault of K.R.E.T. while in Fischer's care.  The jury could have also looked to the testimony regarding B.T.'s inability to recognize or seek help for K.R.E.T.'s developmental delays or the anger issues seen in both D.S.T. and M.J.T.

The jury could have reasonably determined that B.T. was unable to put her children's emotional and physical needs before her own and that she was unable to protect her children from danger now or in the future.  *See In re C.J.*, 392 S.W.3d 763, 770 (Tex. App.—Dallas 2012, no pet.) (looking at domestic violence in the home in a best interests determination).

*3.      B.T.'s abilities*

The evidence was sufficient to find that B.T.'s abilities are limited.  Throughout this case, B.T. has shown that when it comes to caring for her children, she has not exercised good judgment.  The jury could have relied on B.T.'s continued relationship with J.G. and her recommendation for placement of the children with Fischer.  S.H. and B.H. testified that B.T. did not take full advantage of visiting with her children and often cut the visits short.  There was also significant testimony that although B.T. professed that she purchased Christmas gifts for the children, the gifts were never given to the children and she neither visited nor called the children on Christmas.

Based on the evidence presented, the jury could have reasonably concluded that B.T. lacked the decision making skills and parental abilities to provide for and parent her children in a healthy and safe manner.

4.  *Programs Available to Assist B.T. to Promote the Best Interests of the Children*

The evidence clearly supported the conclusion that B.T. was without a support system. Yet, even when the Department made resources available, B.T. did not reach out for assistance. As Steinau explained, the psychological counseling would have provided B.T. with the skills to identify and escape domestic violence. She chose not to participate in the counseling required by the Department. The only exception to this appeared to be B.T.'s attempts at increasing her education. B.T. testified that her degree requirements were almost complete and she was looking forward to her externship. Once again, B.T.'s inability to plan ahead left her without any description of what the externship would entail and how she would provide for childcare during the externship.

5.  *B.T.'s Plans for the Children and Stability of the Home*

Although B.T. professed to have a two-bedroom apartment waiting for her, she clearly could not afford the monthly rent and had not made any arrangements for such. She testified that she brought in about $800 per month from her current job and the rent for the apartment was $900 per month. When asked, B.T. showed little concern for the shortfall. As further evidence of B.T.'s inability to provide for her children, the jury could have reasonably concluded that B.T.'s failure to provide, at any level, for her children during the duration of this case was evidence of her future inability to do so.

6.      *B.T.'s Acts or Omissions Which Indicate the Existing Parent-Child Relationship is Not a Proper One*

The jury need only look at B.T.'s relationship with J.G. for support that B.T. does not have a proper parent-child relationship with her children. She failed to protect them from physical and emotional injury at J.G.'s hands. Moreover, when she was confronted with the evidence against J.G., she discounted the evidence and continued her relationship with him. Additionally, the jury heard testimony from S.H. about B.T.'s inability to discuss the abuse with C.R.A. When C.R.A. asked B.T. about what had transpired, she avoided the question and changed the topic of conversation. Throughout the duration of the case, B.T. failed to take responsibility for placing the children in a dangerous environment or allowing the children to be harmed.

**D.      Analysis**

The jury could have reasonably believed the testimony that J.G. abused all four of B.T.'s children, specifically (1) hitting C.R.A. with a seatbelt and holding his head underwater and (2) hitting K.R.E.T. with such force it caused bruising. The record clearly supports B.T.'s unwillingness to put her children's needs before her own and inability to effect positive changes within a reasonable time. The jury could have also reasonably believed the testimony that B.T. (1) failed to provide a safe and stable home for her children, (2) failed to provide proof of employment, and (3) her inability to appropriately care for her children.

Reviewing the evidence under the two sufficiency standards, and giving due consideration to evidence that the jury could have reasonably found to be clear and convincing, we conclude the jury could have formed a firm belief or conviction that terminating B.T.'s parental rights to K.R.E.T., C.R.A., D.S.T., and M.J.T. was in each child's best interests. *See In re J.F.C.*, 96 S.W.3d at 266; *see also In re H.R.M.*, 209 S.W.3d at 108. Therefore, the evidence is legally and factually

sufficient to support the trial court's order.  *See In re J.F.C.*, 96 S.W.3d at 266; *see also In re H.R.M.*, 209 S.W.3d at 108.

## CONCLUSION

The trial court found B.T. committed the statutory grounds supporting terminating her parental rights and that terminating B.T.'s parental rights was in the children's best interests.  B.T. only appealed the best interest of the children finding.

Having reviewed the evidence, we conclude it was legally and factually sufficient to support the trial court's finding by clear and convincing evidence that termination of B.T.'s parental rights to K.R.E.T., C.R.A., D.S.T., and M.J.T. was in each child's best interest.

Accordingly, we overrule B.T.'s sole issue on appeal and affirm the trial court's order.

Patricia O. Alvarez, Justice