

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00252-CV

_____

IN THE INTEREST OF C.W. AND M.W., CHILDREN

On Appeal from County Court at Law No. 1
Wichita County, Texas
Trial Court No. 13149-JR-E

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

After a bench trial, the trial court terminated Mother's parental rights to her son Charles and daughter Mary.[1] In two issues, Mother contends that the evidence was legally and factually insufficient to support the trial court's findings that (1) she had constructively abandoned her children and shown an inability to provide them with a safe environment and (2) termination was in her children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N)(iii), (b)(2). With regard to the first issue, because the trial court based its termination decree on four grounds, and because Mother attacks only one of the four, we can affirm the judgment based on the three grounds that she has not contested. We overrule Mother's second issue because legally and factually sufficient evidence supports the trial court's finding that termination was in the children's best interest. Therefore, we affirm the trial court's judgment.

## II. BACKGROUND

In May 2018, the Texas Department of Family and Protective Services filed a "Petition for Order to Participate in Services" in which it named Mother as a

---

[1]We use aliases to identify the children, and we identify family members by their relationship to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

respondent.[2] In the supporting affidavit, the Department reported that the police department had made a referral on April 12, 2018, after the police had responded to a family disturbance during which Mother and Father had engaged in domestic violence in the children's presence.

Thereafter, in the Department's November 29, 2018 "Compliance Report," it stated that Mother had "failed to complete services that were ordered by this court," that she had "become increasingly uncooperative," and that "the Department ha[d] new concerns." Three of the Department's listed new concerns (among others) were:

- Mother had been arrested in August 2018 for driving while intoxicated after running her car into a residence and leaving the scene;

- the police were called to Mother's residence in September 2018 because Mary was missing; and

- the Department learned in October 2018 that Mary had missed nineteen days of school, that the school had asked Mother to meet with school personnel to discuss Mary's attendance, and that Mother had never contacted the school.

The report concluded, "The Department believes that a non-emergency removal is warranted in this case."

---

[2]The Department also named Father as a respondent, but his parental rights were terminated separately from Mother's. In addition to Charles and Mary, a third child (Ann) was initially involved in this suit. Ann's case was disposed of independently. By the time of trial, only Mother's parental rights to Charles and Mary remained in dispute. Because neither Father nor Ann were pertinent to that trial or relevant to this appeal, we do not include them in the procedural background.

On December 12, 2018, the Department filed its "Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent–Child Relationship." On January 9, 2019, after a show-cause hearing at which Mother did not appear, the trial court appointed the Department as the children's temporary managing conservator. Mother admitted having been served and knowing that the Department had taken her children, but she did not remember why she did not appear.

For over two years, Mother did not work her services and continued to use drugs.[3] During that time, Mother was arrested twice—once for possession of a controlled substance and once for domestic violence. And while the children remained in foster care, Mother found a new boyfriend, who was a felon and drug addict and who engaged in domestic violence against Mother. In February 2021, Mother decided that she wanted to get her children back, so she stopped using drugs, started working her services, became employed around March, rented a house in April, and broke up with her boyfriend in May.

Over two-and-one-half years after the children had been removed, in August 2021, the parties proceeded to a bench trial. By the time of trial, Mother had not seen or had contact with her children for about a year and a half.

---

[3]The case went beyond the normal time limits. *See* Tex. Fam. Code Ann. § 263.401. Much of the delay was allegedly COVID related.

4

On August 13, 2021, the trial court signed a termination judgment. In it, the trial court found that termination was in the children's best interest and that Mother had transgressed four grounds for termination. Specifically, the trial court found that she had:

- knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being;

- engaged in conduct or knowingly placed the children with persons who had engaged in conduct that endangered the children's physical or emotional well-being;

- constructively abandoned the children, who had been in the permanent or temporary managing conservatorship of the Department for not less than six months and: (1) the Department had made reasonable efforts to return the children to her; (2) she had not regularly visited or maintained significant contact with the children; and (3) she had demonstrated an inability to provide the children with a safe environment; and

- failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children, who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from her for abuse or neglect under Chapter 262.

*Id.* § 161.001(b)(1)(D), (E), (N), (O).

### III. DISCUSSION

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit.

*Id.* § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001(b), .206(a); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, that (1) the parent's actions satisfy just one of the many predicate grounds that are listed in Subsection 161.001(b)(1) of the Texas Family Code and (2) termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

6

Mother's first issue addresses the grounds requirement. Her second issue addresses the best-interest requirement.[4]

## A. First Issue

In Mother's first issue, she contends that the evidence is legally and factually insufficient to support the trial court's finding that she had shown an inability to provide the children with a safe environment, which was one of the elements needed to find the ground of constructive abandonment under Section 161.001(b)(1)(N). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(N).

The trial court found four statutory violations under Section 161.001(b)(1), but Mother challenges only one of the four. In doing so, she concedes the other three findings. *See In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). We need not address Mother's attack on the one finding because we can affirm on the bases of the other three. *See id.*; *see also* Tex. R. App. P. 47.1. With a caveat not applicable here, only one finding is necessary.[5] *See L.M.*, 104 S.W.3d at 647. Therefore, we overrule Mother's first issue.

---

[4]In the table of contents of Mother's brief, she lists these two issues, but when presenting her issues, she identifies three. She never addresses the third one in the argument portion of her brief. To the extent that Mother intended to assert a third issue, she waived it. *See Moseley v. Arnold*, 486 S.W.3d 656, 660 n.5 (Tex. App.— Texarkana 2016, no pet.).

[5]If the trial court terminates on multiple grounds, if grounds under Sections 161.001(b)(1)(D) or (E) are among those grounds, and if the parent challenges the findings on the (D) and (E) grounds, the appellate court must address either the (D) or (E) grounds on appeal (or both if neither withstands appellate

The success of Mother's appeal thus turns on whether the evidence was legally and factually sufficient to support the trial court's best-interest finding. *Id.*

## B. Second Issue

In Mother's second issue, she attacks the legal and factual sufficiency of the evidence supporting the trial court's finding that termination was in her children's best interest.

### 1. Applicable Law

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative both of grounds under section 161.001(b)(1) and of best interest under section 161.001(b)(2). *Id.* at 249; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Nonexclusive factors that the factfinder in a termination case may also use in determining the child's best interest include:

---

review) because they may have collateral consequences if the parent has other children. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (providing that a prior termination under (D) or (E) is a ground for terminating parental rights to a different child); *In re L.G.*, 596 S.W.3d 778, 780 (Tex. 2020); *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) ("Allowing section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal *when the parent has presented the issue to the court* . . . violates the parent's due process and due course of law rights." (emphasis added)). Mother has not contested the (D) and (E) findings, so this exception to the general rule does not apply.

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

### 2. Standard of Review

#### a. Legal Sufficiency

In evaluating the evidence for legal sufficiency in parental-rights-termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved both the particular ground for termination and that termination was in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment, and we resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. We also must disregard all evidence contrary to the finding that a reasonable factfinder could have disbelieved, in addition to considering undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we cannot weigh witness-credibility issues that depend on the witness's appearance and demeanor; that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations so long as they are not unreasonable. *Id.*

#### b. Factual Sufficiency

We must perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support terminating a parent–child

10

relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In a factual-sufficiency review, we give due deference to the factfinder's findings and do not supplant its judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction that the parent violated an alleged ground and that termination was in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *see C.H.*, 89 S.W.3d at 25. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

### 3. Discussion

#### a. Children's Desires

At the time of trial in August 2021, Charles and Mary were twelve and nine years old respectively. Neither child testified at trial, and whether they possessed sufficient maturity to express an opinion regarding a parental preference is questionable. *See In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.); *see also* Tex. Fam. Code. Ann. §§ 153.134(a)(6), 156.101(a)(2) (both providing that a child must be at least twelve years old before the child's preference, if any, regarding the person to have the exclusive right to designate the child's primary residence becomes a factor).

11

The children had not seen Mother since February 2020, so they had not seen her in about eighteen months. During that time, Mother did not send them any birthday cards or Christmas gifts and had not even spoken to them on the telephone. In Mother's past visits, though, the caseworker (Shea Coats) acknowledged that the children seemed bonded to her.

The trial court appointed CASA[6] of Red River as the children's guardian ad litem. The CASA supervisor assigned to the case in the spring of 2021, Amanda Mataska, testified that when she and the children engaged in general conversations, they never mentioned Mother, but when Mataska specifically asked them about Mother, they would say that they missed her.

Overall, because there was no evidence of the children's desires, we conclude that this factor is neutral. *See In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.) ("[T]he first *Holley* factor is neutral because no evidence of the children's desires was presented. . . . A description of the parent's love for or interest in the children and the fact that she visited them and tried to comply with her service plan does not provide us with evidence concerning the desires of the children themselves.").

---

[6]"A 'CASA' is a court appointed special advocate." *In re J.L.*, No. 13-07-00345-CV, 2010 WL 746702, at *4 n.29 (Tex. App.—Corpus Christi March 4, 2010, no pet.) (mem. op.).

### b. Children's Emotional and Physical Needs Now and in the Future and the Emotional and Physical Danger to the Children Now and in the Future

Children need long-term safety and stability. *See* Tex. Fam. Code Ann. § 263.307(a) ("[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest."); *In re M.A.J.*, 612 S.W.3d 398, 411 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g); *A.C. v. Tex. Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 705–06 (Tex. App.—Austin 2019, pet. denied). Mother posed a danger to both due to issues of domestic violence and drug use.

### i. Domestic Violence

Both children had aggressive behavioral issues. Mother herself admitted that her children had learned that behavior from home.

Because of the children's aggressive behavior, they had been in five placements over the course of the case. The first caseworker (and the current supervisor), Coats, testified that allowing children to remain in homes with domestic violence endangers their physical and emotional well-being. And the second caseworker, Chantelle Prince-Cowan, stated that returning the children to Mother would significantly impair their physical and emotional well-being.

During Mother's twelve-year relationship with Father, she estimated that they had engaged in physical domestic violence five to ten times and had engaged in emotional domestic violence between fifty and one hundred times. She estimated that

the police were called "[m]aybe five" times and that the police arrested her on one occasion and arrested Father on another. According to Mother, she and Father had separated in October 2019 and were now divorced.

Mother was not necessarily always the victim of domestic violence; she admitted that she went to jail in May 2019 on an assault charge against her mother-in-law but maintained that the charges had been dismissed. By way of explanation, Mother said that her mother-in-law had assaulted her twice before the May 2019 incident.

After deciding to engage in services in February 2021, Mother completed an anger management class in June 2021. Mother admitted having a prior case with Child Protective Services (CPS) in 2015 for domestic violence during which she received anger-management and domestic-violence counseling.

Mother also had a 2007 CPS case involving Ann, but Mother denied that the Department had made a "reason-to-believe" disposition against her for neglectful supervision and asserted that the Department had returned Ann to her in 2008.[7] As part of that CPS case, Mother had received in-home parenting and counseling sessions.

---

[7]After investigating allegations of child abuse or neglect, CPS will assign one of five possible dispositions: (1) reason to believe (based on a preponderance of the evidence); (2) ruled out; (3) unable to complete; (4) unable to determine; or (5) administrative closure. *In re Z.G.*, No. 02-19-00352-CV, 2021 WL 1229967, at *24 (Tex. App.—Fort Worth Apr. 1, 2021, no pet.) (mem. op.).

Mother had a fourth child who was not the subject of this suit, Robert. While Mother was in an Arizona domestic violence shelter, the Arizona CPS removed Robert from his father. Mother conceded the obvious implication—she and Robert's father had engaged in domestic violence too. Mother maintained that after the removal, the Arizona CPS was dismissed from the case, Robert was made a ward of the state, and he lived with his grandmother until he was eighteen years old. Mother agreed with placing Robert with his grandmother. Robert was now eighteen and out of school.

Both Prince-Cowan and Mataska reported that Charles and Mary had made progress. Mataska, however, added that Charles "still [had] a long way[ ] to go."

At one point during the case, the children were placed with Father for a monitored return, but that ended badly. Father assaulted Mary. After being placed with Father, the children's behavior became worse.

### ii. Drugs

In addition to domestic violence, another concern was Mother's drug use. Mother admitted that when she did drugs, she used methamphetamine, marijuana, and alcohol. Coats stated that "children being around people who use drugs endangers them." Coats elaborated that not only might the children be exposed to the drugs, but also the children's caregivers while under the drugs' influence are not able to properly supervise them.

15

Mother maintained, however, that she had not used any drugs since February 2021. Prince-Cowan provided testimony supporting Mother's assertion. She stated that after Mother tested positive for methamphetamine and marijuana on February 5, 2021, and was a no-show for her February 25, 2021 drug screening, Mother thereafter tested negative on all of her subsequent urinalyses and hair-follicle tests.

Mother's drug history, though, was extensive. She admitted that she had started using methamphetamine when she eighteen or nineteen years old in 2003, stopped using drugs around 2006, and then resumed her drug habit around 2014. When asked why she had not engaged in services or attended any hearings in the case until July 2019 when her children were removed in January 2019, Mother responded, "I was using, ma'am."

According to Prince-Cowan, for the first twenty-six months of the case—from December 2018 through February 2021—Mother had fifteen no-shows for drug testing, a couple of occasions when she appeared for the test but refused to take it, and positive drug screens.[8] Mother acknowledged that she had been told that if she did not submit to drug tests, the results would be recorded as positive, and she understood the rationale behind that result: "Because [people] would only take a drug

---

[8]Prince-Cowan testified that Mother had refused to be tested a couple of times, but the Department's July 2021 permanency report to the court identified only one refusal.

test if they were clean." Prince-Cowan explained that one of the reasons that Mother's visits with the children were stopped was because Mother was not taking her drug tests.

The Department's July 2021 permanency report to the court shows that Mother took her first drug test in July 2019 and tested negative, tested positive for methamphetamine in December 2019, and did not take another test until a year later in December 2020, when she tested positive for amphetamine.[9] After testing positive for amphetamine in December 2020, Mother tested positive for methamphetamine and marijuana in February 2021. Thereafter, she tested negative for illegal drugs.

### iii. Conclusion

A reasonable factfinder could question whether domestic violence and drug use were things of the past. Neither were aberrations; Mother had a long history of both. From a parent's past misconduct, a factfinder may infer a parent's future conduct. *See A.S. v. Tex. Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 714 (Tex. App.—El Paso 2012, no pet.) ("[E]vidence of past misconduct or neglect is permissible as an inference that a parent's future conduct may be measured by their past conduct.").

We conclude that these factors support the trial court's termination finding.

---

[9]Amphetamine is a metabolite of methamphetamine. *See In re R.A.*, No. 02-18-00252-CV, 2019 WL 490121, at *3 (Tex. App.—Fort Worth Feb. 7, 2019, no pet.) (mem. op.); *see also Guillory v. State*, No. 09-19-00359-CR, 2021 WL 3518891, at *3 (Tex. App.—Beaumont Aug. 11, 2021, no pet.) (mem. op., not designated for publication); *Moreno v. State*, 586 S.W.3d 472, 486 (Tex. App.—Dallas 2019), *rev'd on other grounds*, 605 S.W.3d 475 (Tex. Crim. App. 2020).

### c. Parental Abilities of the Individuals Seeking Custody

As a parent, Mother consistently showed poor judgment. For example, when visiting the children in March 2019, Mother became very upset, yelled, and cursed to the point that the children began crying. A supervisor had to calm Mother down and end the visit. Rather than engage and reassure her children, she upset them. *See In re J.L.M.*, No. 01-16-00445-CV, 2016 WL 6754779, at *10 (Tex. App.—Houston [1st Dist.] Nov. 15, 2016, no pet.) (mem. op.) (considering evidence that during supervised visits with children, parent screamed and cursed at DFPS supervisor and police were called); *Liu v. Dep't of Fam. & Protective Servs.*, 273 S.W.3d 785, 798 (Tex. App.—Houston [1st Dist.] 2008, no pet.) ("During a few visits . . . , [the mother] was disruptive, yelling and screaming at the supervisor or foster parents . . . .").

In December 2019, after being told expressly not to give the children a cell phone without checking with the foster parents first, Mother tried to sneak a cell phone to the children during a visit. If Mother had succeeded, neither the Department nor the foster parents would have been able to supervise the calls between Mother and the children. *See In re A.F.*, No. 04-20-00216-CV, 2020 WL 6928390, at *4 (Tex. App.—San Antonio Nov. 25, 2020, no pet.) (mem. op.) ("The court also heard testimony from the CASA volunteer that [the mother had] snuck a cell phone to [her daughter] at a visit, and then used it to send her daughter an inappropriate text message."); *In re V.G.*, No. 04-08-00522-CV, 2009 WL 2767040, at *8 (Tex. App.—San Antonio Aug. 31, 2009, no pet.) (mem. op.) ("[The parents]

secretly gave [their son] a cell phone during a visitation, which [the child's counselor] believed was done so the parents could talk to him and influence what he might say. This surreptitious behavior by the parents further endangered [the child's] psychological condition."), *superseded by statute on other grounds,* Tex. Fam. Code Ann. § 107.013(a), (a-1), *as recognized by In re D.T.*, 625 S.W.3d 62, 70–73 (Tex. 2021); *In re H.H.*, No. 2-05-093-CV, 2006 WL 176858, at \*4 (Tex. App.—Fort Worth Jan. 26, 2006, no pet.) (per curiam) (mem. op.) (sneaking cell phone to daughter so that daughter could call father without foster parent's knowledge).

Also in December 2019, Mother began to talk to the children about the case and made "snide comments" about the caseworkers and Father, so Mother had to be "redirected several times." Mother was not using her visit to maintain her bonds with the children but to seed discontent in the children with their caseworkers and Father. Poisoning a child's mind against a parent or caregiver is not in the child's best interest. *See In re T.L.C.*, No. 01-17-00498-CV, 2018 WL 4139004, at \*21 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, pets. denied) (mem. op.); *see also Allen v. Allen*, 475 S.W.3d 453, 458 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("[P]ersistent alienation of the other parent can be a guiding consideration in making possession and access determinations."); *In re Marriage of Chandler*, 914 S.W.2d 252, 254 (Tex. App.—Amarillo 1996, no writ) ("[C]hanges which may injuriously affect the child's best interest" include, "among other things, . . . poisoning the child's mind against a parent . . . .").

19

Then in April 2020, Ann (the third child who had originally been part of the case) ran away from her placement. Although the Department and "law enforcement" had asked Mother several times about Ann, Mother remained silent. In the end, the Department found Ann with Mother in Mother's apartment. Hiding Ann was not the responsible choice. *See In re A.A.H.*, Nos. 01-19-00612-CV, 01-19-00748-CV, 2020 WL 1056941, at *16 (Tex. App.—Houston [1st Dist.] Mar. 5, 2020, pet. denied) (mem. op.) ("Regarding parental abilities, Mother's parental skills were demonstrably lacking . . . . There was . . . evidence that Mother hid the children from the Department . . . ."); *In re R.L.*, Nos. 01-16-00851-CV, 01-16-00852-CV, 01-16-00875-CV, 2017 WL 1496955, at *17 (Tex. App.—Houston [1st Dist.] Apr. 21, 2017, no pet.) (mem. op.) ("[T]he trial court heard testimony that [the mother] is not trustworthy and has engaged in certain dishonest behavior both before and during the pendency of this case that has had a detrimental effect on the children."); *In re C.J.*, 392 S.W.3d 763, 771 (Tex. App.—Dallas 2012, pet. denied) (hiding children from CPS for almost five months was one of the reasons supporting termination of the father's parental rights).

Although the Department removed Mother's children in January 2019, Mother admitted that she waited for more than two years—until February 2021—to try to get them back. Mataska had "concerns" that it took Mother so long to engage in services. This lengthy indifference is inconsistent with the actions of a devoted parent. *See In re K.S.L.*, 538 S.W.3d 107, 115 (Tex. 2017) (stating that delay in determining where and

20

with whom a child lives inherently threatens the child's best interest); *In re M.K.*, No. 02-19-00459-CV, 2020 WL 1949629, at *6 (Tex. App.—Fort Worth Apr. 23, 2020, no pet.) (mem. op.) (identifying the father's indifference toward the child as a basis for endangering the child). Rather than work toward getting her children back, Mother chose to use drugs. *See In re R.S.*, No. 01-20-00126-CV, 2020 WL 4289978, at *7 (Tex. App.—Houston [1st Dist.] July 28, 2020, no pet.) (mem. op.) ("The father's use of methamphetamine after [the] removal is especially significant because [his] decision to use drugs when his parental rights are in jeopardy evidences [a] conscious indifference [about] the parent–child relationship . . . or an inability or unwillingness to prioritize the child's wellbeing ahead of drugs."); *In re E.R.W.*, 528 S.W.3d 251, 264–65 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being.").

This factor supports the trial court's finding that termination was in the children's best interest.

### d. Programs Available to Assist These Individuals to Promote the Children's Best Interest

The children were receiving counseling, and continuing their counseling was important. Coats said that Charles was "an ongoing process," and Mataska said that Charles had a long way to go. According to Mataska, Mary had made much progress:

"[F]rom what I read from the previous CASA [worker], . . . there were a lot of tantrums, breaking items, not minding, just being a little -- being a terror," but from Mataska's own "experiences with [Mary, she found her to be] a sweet and bubbly little girl." Mother was aware that the children were undergoing counseling because both were prone to violence, and she asserted that if they were placed with her, she would continue the children's counseling and manage their medications.

Mother herself was diagnosed with anxiety, depression, and methamphetamine abuse. Mother said that she had been on medications for about six months and that she had been attending sessions to address her substance-abuse problem. Mother was getting her medications through her counseling services. Coats testified, however, that at times Mother was not compliant about taking her medications.

Even when Mother accessed programs in the past, the evidence suggested that her conduct remained the same. Before this case, Mother had a previous CPS case in Arizona and two previous CPS cases in Texas. Regarding Mother's completing an anger-management class on June 1, 2021, Prince-Cowan explained that Mother had been asked to do a second anger-management class because "[s]he would become very hostile, . . . make threatening comments regarding people, and lose her temper in several different manners." For example, Mother once threatened to hunt down Father and his paramour and beat or kill them. Mother also threatened to give Coats a beating and told her that she would burn in hell. Based on comments like those,

22

Prince-Cowan did not believe that Mother had learned anything from any prior anger-management classes.

When it came to services, Prince-Cowan testified that Mother would "check the boxes." By this, Prince-Cowan said that Mother would complete services so that she could check the box showing that she had complied, but despite completing the services and checking the box, Mother could not show that she had learned anything.

As an example, Prince-Cowan explained that the reason that Father had managed to get a monitored return was because "he had checked the boxes." According to Prince-Cowan, she personally was against the monitored return to Father because despite his checking the boxes, she did not believe that "he had made an honest, true lifestyle change." And ultimately, she turned out to be right about Father. Checking the boxes and learning new behaviors were not necessarily the same thing, and Prince-Cowan thought that Mother, like Father, could check the boxes but would not change her behavior. Therefore, Prince-Cowan testified that it was in the best interest of the children to terminate Mother's parental rights.

If Mother's parental rights were terminated, whether she continued her counseling and medications would—from the perspective of the children's safety and security—become moot. But if Mother's rights were not terminated, the evidence did not show whether she planned on continuing her counseling and medications. Whether Mother saw her counseling and medications as a stopgap to get her children back or as a continuing feature of her life was not clear.

Even with programs available to help Mother and the children, Mother's willingness to access the programs and ability to follow through with them appeared questionable. A reasonable factfinder could doubt her dependability on both counts. *See In re H.B.C.*, 482 S.W.3d 696, 699 (Tex. App.—Texarkana 2016, no pet.) ("[Grandmother] opined that [Mother] was simply incapable of dependably assuming the responsibility of being a parent."). In contrast, the Department had placed the children in counseling and had persisted in providing counseling for them.

This factor favors the trial court's best-interest finding.

### e. Plans for the Children by These Individuals or by the Agency Seeking Custody

If the children were placed with Mother, she said that her mother (Grandmother) and sister (Aunt) would help her with childcare. Both Grandmother and Aunt, however, had CPS histories. Mother acknowledged that Grandmother was a recovering alcoholic but maintained that Grandmother's alcoholism dated from the 1990s and that she no longer used drugs or alcohol. Aunt had a history of drug use and had lost one of her children to CPS conservatorship.

At some point in 2020, Mother had a boyfriend, John Doe.[10] He too engaged in domestic violence against Mother, but she admitted that she wanted to drop the charges against him, and she signed an affidavit of nonprosecution on

---

[10]We use an alias for Mother's boyfriend.

January 11, 2021. Doe was also a drug addict and convicted felon. Mother and Doe had used methamphetamine together, and Doe kept guns in the house.

Mother maintained that she had broken up with Doe in May 2021 because he did not support her decision to try to get her children back. But the caseworkers questioned Mother's testimony. Prince-Cowan thought that Mother's relationship with Doe lasted into June 2021. Coats said that the first time that she had heard of a breakup between Mother and Doe was while Mother was testifying; Coats expressed doubt about whether they had broken up.

As for housing, Mother had a month-to-month lease on a three-bedroom, one bathroom house. Prince-Cowan said that the house itself was safe and stable but denied that Mother could provide a safe environment because of the concerns about domestic violence and drug use. Assuming that Mother was living alone in the house and was not using drugs, Prince-Cowan agreed that the home environment would be safe.

Mother's admitted plans included Grandmother (a recovering alcoholic with a CPS history) and Aunt (known to have drug issues and a CPS history). Thus, assuming that Doe truly was out of Mother's life and that Mother's next boyfriend did not engage in domestic violence, a factfinder could nevertheless reasonably conclude that Mother intended to expose the children to an inherently suspect environment. *See In re M.D.M.*, 579 S.W.3d 744, 773 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("[T]he Department . . . presented evidence that the children had been exposed to an

endangering environment when they lived with [their] [m]other, that [both fathers] knew about this dangerous environment, and that they provided no assistance in improving the children's living situation.").

Despite the children's behavioral issues, Prince-Cowan said that they were capable of being adopted. Coats said that the children were not currently in an adoptive home because of their behavior and because, at that time, there were not many adoptive homes. Coats averred that the children might not be adopted in the near future but was persuaded that, in time, they would be.

This factor supports the trial court's best-interest finding.

### f. Stability of the Home or Proposed Placement

Since January 2019, not counting Mother's two stays in jail, she had lived in four or five locations. Mother was in jail about two months in 2019 for domestic violence and was in jail again for about three weeks in January 2020 for possession of a controlled substance.

From a stability standpoint, the children did not fare much better. While in the Department's care, they had been in five placements.

"[C]hildren need permanency and stability." *In re G.V., III*, 543 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. denied). A child's need for permanence through the establishment of a stable, permanent home is a paramount consideration in the best-interest determination. *E.R.W.*, 528 S.W.3d at 267.

Mother testified that since 2019, she had worked only the five months preceding trial. Before that, she had not worked since 2017. Mother's lease was month to month. Although gaining employment and having a lease were steps in the right direction, in the context of a case that had been going on about thirty months, they were weak evidence of stability. Evidence of improved conduct, especially of short duration, does not negate the probative value of or absolve a parent from a long history of irresponsible choices. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009); *In re J.F.-G.*, 612 S.W.3d 373, 384 (Tex. App.—Waco 2020) (mem. op.), *aff'd*, 627 S.W.3d 304 (Tex. 2021). Rehabilitation does not negate past conduct such that a factfinder cannot consider it. *In re J.F.-G.*, 627 S.W.3d 304, 317 (Tex. 2021).

If Mother's parental rights were terminated, whether she continued to have employment and a stable home would not be concerns that affected the children's safety and stability. And the Department, instead of keeping the children in conservatorship limbo, could focus on finding an adoptive family—a "forever" family—for the children, a goal that is not possible so long as Mother's parental rights remain intact. *See In re J.W.T.*, 872 S.W.2d 189, 198 n.26 (Tex. 1994) (op. on reh'g); *In re D.D.*, No. 02-17-00368-CV, 2018 WL 1630708, at *11 (Tex. App.—Fort Worth Apr. 5, 2018, no pet.) (per curiam) (mem. op.) ("Mother and Father wanted . . . to . . . leave [their child] in the managing conservatorship of the [Department]," but "that decision would have left [their child] with more uncertainty and instability because he could be moved around from foster home to foster home until he aged out of the

system without having 'a chance to heal' or 'the safety of a forever family.'"); *In re D.G.*, No. 06-15-00025-CV, 2015 WL 6520251, at *5 (Tex. App.—Texarkana Oct. 28, 2015, pet. denied) (mem. op.) ("[The CASA program director] opined that termination would be in the best interest of the children since they would be in a 'forever' family if adopted and have permanence, stability, safety, guidance, consistency, and positive role models."). Termination of parental rights is a prerequisite to a valid adoption. *J.W.T.*, 872 S.W.2d at 198 n.26. The Department was confident that it could find a "forever" home for the children.

This factor supports the trial court's finding that termination was in the children's best interest.

### g. Parent's Acts or Omissions that May Indicate that the Existing Parent–Child Relationship is Not a Proper One and Parent's Excuse, if Any, for the Acts or Omissions

Mother did not dispute her history of drug abuse and domestic violence. She maintained that she had been clean for five months and that she had completed the anger-management class on June 1, 2021. The trial court's horizon, however, was not limited to the five months before trial. The Department had removed the children over two-and-one-half years earlier.

Mataska addressed Mother's recent improvement with the overall picture. Initially, based on what Mataska had personally observed, she expressed reservations: "[W]ith only being on the case for three and a half months, [I] do not believe that I can [say] what is in their best interest. . . . I do not believe personally that I can state

28

[that] just after three and a half months." She added, "Since I personally have been on the case, I've seen [Mother] sober and on her medication and she's never yelled or cussed at me." Mataska's opinion, based on what she had seen personally, was that termination was not necessary, but she acknowledged that CASA had "to look at the big picture," and CASA—the organization—recommended termination.

Later, Mataska gave her opinion when not limiting it to what she had personally seen:

> Q[.] While you may not have seen anything personally in the last five months, would you agree with me that this is not a five-month case?
>
> A[.] Correct.
>
> Q[.] So not just looking at what you've looked at for five months personally and heard her say that she's not doing drugs and she's tested negative --
>
> A[.] Correct.
>
> Q[.] -- but when you looked at everything, because it is not a five-month case, do you still believe it's not in the children's best interest to terminate?
>
> A[.] Looking at everything, I do believe it is in the best interest to terminate.

When determining who will raise a child and where the child will live, undue delays and needless uncertainty inherently threaten the child's best interest. *K.S.L.*, 538 S.W.3d at 115. Mother needlessly complicated the conservatorship issue and unduly delayed the case by waiting so long to work services.

These factors support the trial court's best-interest finding.

29

### h. Analysis and Holding

The Department removed the children from an unstable environment. For over two years after the children's removal, Mother did nothing to address the conduct that had led to their removal. Despite Mother's belated efforts, many questions and much doubt persisted. She had taken domestic-violence and anger-management classes before, but the violence persisted. She had been clean before, but she relapsed.

For two years while Mother's children were in foster care, she used drugs. After her relationship with Father ended, she started a new relationship with a man who was a drug addict and felon and who engaged in domestic violence. Mother engaged in all of this conduct while knowing that her parental rights were at risk. *See E.R.W.*, 528 S.W.3d at 264–65.

We hold that the evidence is legally and factually sufficient to show that terminating Mother's parental rights was in the best interest of Charles and Mary. *See J.F.C.*, 96 S.W.3d at 265–66 (stating that to be legally sufficient, when viewing the evidence in the light most favorable to the finding, the court must conclude that the evidence was such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations); *id.* at 266 (citing *C.H.*, 89 S.W.3d at 25) (stating that to be factually sufficient, based on the entire record, the court must conclude that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations); *In re R.W.*, 627 S.W.3d 501, 506, 516–18 (Tex.

30

App.—Texarkana 2021, no pet.) (overruling issue contending that evidence was legally and factually insufficient to support best-interest finding).

We overrule Mother's second issue.

## IV. CONCLUSION

Having overruled both of Mother's issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered: January 13, 2022